USCA1 Opinion

 

 October 3, 1995 United States Court of Appeals For the First Circuit ____________________ No. 92-1923 UNITED STATES OF AMERICA, Appellee, v. JULIO LUCIANO-MOSQUERA, Defendant, Appellant. ____________________ No. 92-1924 UNITED STATES OF AMERICA, Appellee, v. RAUL LUGO-MAYA, Defendant, Appellant. ____________________ No. 92-1925 UNITED STATES OF AMERICA, Appellee, v. RAFAEL PAVA-BUELBA, Defendant, Appellant. ____________________ No. 92-1973 UNITED STATES OF AMERICA, Appellee, v. CARLOS PAGAN-SAN-MIGUEL, Defendant, Appellant. ____________________ No. 92-1974 UNITED STATES OF AMERICA, Appellee, v. EDGAR GONZALEZ-VALENTIN, Defendant, Appellant. ____________________ No. 94-1657 UNITED STATES OF AMERICA, Appellee, v. CARLOS PAGAN-SAN-MIGUEL, Defendant, Appellant. ____________________ ERRATA SHEET The opinion of this court issued on August 28, 1995 is amended as follows: On page 35, lines 8-9, substitute "This argument is meritless."  for "This argument was not raised below, is reviewed for plain error, and is meritless." United States Court of Appeals For the First Circuit ____________________ No. 92-1923 UNITED STATES OF AMERICA, Appellee, v. JULIO LUCIANO-MOSQUERA, Defendant, Appellant. ____________________ No. 92-1924 UNITED STATES OF AMERICA, Appellee, v. RAUL LUGO-MAYA, Defendant, Appellant. ____________________ No. 92-1925 UNITED STATES OF AMERICA, Appellee, v. RAFAEL PAVA-BUELBA, Defendant, Appellant. ____________________ No. 92-1973 UNITED STATES OF AMERICA, Appellee, v. CARLOS PAGAN-SAN-MIGUEL, Defendant, Appellant. ____________________ No. 92-1974 UNITED STATES OF AMERICA, Appellee, v. EDGAR GONZALEZ-VALENTIN, Defendant, Appellant. ____________________ No. 94-1657 UNITED STATES OF AMERICA, Appellee, v. CARLOS PAGAN-SAN-MIGUEL, Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Carmen Consuelo Cerezo, U.S. District Judge] ___________________ ____________________ Before Selya, Boudin and Lynch, Circuit Judges. ______________ ____________________ Lydia Lizarribar-Masini for appellant Luciano-Mosquera. _______________________ Ramon Garcia for appellant Lugo-Maya. ____________ Rafael Gonzalez Velez for appellant Pava-Buelba. _____________________ Frank A. Ortiz for appellant Pagan-San-Miguel. ______________ Wilfredo Rios Mendez for appellant Gonzalez-Valentin. ____________________ Epifanio Morales Cruz, Assistant United States Attorney, with _____________________ whom Guillermo Gil, United States Attorney, Jose A. Quiles Espinosa, _____________ _______________________ Senior Litigation Counsel, and Nelson Perez-Sosa, Assistant United _________________ States Attorney, were on brief, for United States. ____________________ August 28, 1995 ____________________ LYNCH, Circuit Judge. At 2:45 a.m. on March 27, LYNCH, Circuit Judge. _____________ 1991, in the darkness of the night over a Puerto Rico beach, government flares brightened the sky as waiting police and customs officers surprised and arrested six men offloading eight bales of cocaine from two yawls. The men had brought 232.8 kilograms of cocaine to this country from Colombia. Others involved were arrested on land and on sea. Those arrests led ultimately to these appeals by five of the men, Carlos Pagan-San-Miguel, Edgar Gonzalez-Valentin, Raul Lugo- Maya, Rafael Pava-Buelba and Julio Luciano-Mosquera.  The appeals variously raise challenges to the sufficiency of the evidence, to limitation of cross- examination, to the admissibility of one defendant's statement, to remarks made during summation, to the reading of the transcript of trial testimony to the jury, to jury instructions, to the delay in transcribing the trial transcript, and to their sentences. Of these, only one raises serious issues -- the question of the sufficiency of the evidence to support the convictions for carrying or aiding and abetting the carrying of a firearm during and in relation to the drug offense as to certain defendants. The convictions of defendants Pava-Buelba and Lugo- Maya are reversed on the firearms count (Count 4) and their sentences on that count are vacated. We affirm their convictions and sentences on the drug counts (Counts 1-3). -4- 4 The convictions and sentences of defendants Pagan-San-Miguel, Gonzalez-Valentin, and Luciano-Mosquera are affirmed on all counts. I. FACTS The jury heard or could properly infer the following facts. Oscar Fontalvo arrived in Puerto Rico in January 1991 to organize a scheme to smuggle cocaine into Puerto Rico. The scheme involved the drugs being flown from Colombia, airdropped into the sea at a prearranged location, picked up by a waiting boat and then sailed ashore. In drug parlance, this operation is called a "bombardeo." The waiting boat is called the "mothership." Fontalvo enlisted Pagan-San-Miguel and Jose Perez-Perez, who were to be paid in kind with 50 kilograms of cocaine. Pagan-San-Miguel introduced Fontalvo to Luis Soltero-Lopez, who agreed that his boat, the F/V Marlyn, would be used as the mothership. Soltero-Lopez recruited Jonas Castillo-Ramos to be captain, and Castillo-Ramos recruited two crew members for the drug run. The operation was planned at a number of meetings in Puerto Rico in March 1991. Fontalvo, Pagan-San-Miguel, Perez-Perez and Soltero-Lopez attended the meetings. At least two of these meetings were at the home of Gonzalez- Valentin and, the jury could have inferred, Gonzalez-Valentin was there for at least one. -5- 5 Perez-Perez brought a bag to one of the meetings at Gonzalez-Valentin's house. Pagan-San-Miguel and Perez-Perez opened the bag and showed Fontalvo and the others there (including Gonzalez-Valentin) a Colt M-16, Model A-1, 5.56 caliber fully automatic sub-machine gun with an obliterated serial number (the "M-16"). Later during the meeting, Perez- Perez brought Fontalvo over to his pick-up truck and pulled out from under the front seat an Intratec, Model TEC-9, semi- automatic .9mm pistol (the "Intratec pistol"). Referring to the weapons, Pagan-San-Miguel said they had brought them.  Communication amongst the Colombian and Puerto Rican participants, the plane, and the F/V Marlyn was essential. Pagan-San-Miguel and Fontalvo went to Miami and purchased a radio and antenna. Pagan-San-Miguel and Perez- Perez installed them on the F/V Marlyn in Puerto Rico. Code names were used for radio transmissions. The Colombian dispatcher was "Khadafi"; Pagan-San-Miguel was "Gigante" or "Padrino" or "Godfather." Fontalvo and Pagan-San-Miguel handled radio communications and set up a radio in the backyard of Gonzalez-Valentin's house, hiding it in a child's playhouse. Soltero-Lopez, the F/V Marlyn's owner, flew to Colombia to board the plane so that during the bombardeo he could identify his boat and insure the drop was not made to the wrong boat (a not uncommon event). The F/V Marlyn went -6- 6 to the Dominican Republic to prepare for the airdrop. The Colombian drug owners, assigned a Colombian, Pava-Buelba, as a "load watcher" to observe the operation and report to the Colombian suppliers about the fate of the delivery. Pava- Buelba went to the Dominican Republic to meet Castillo-Ramos and the mothership. On March 25, 1991, the F/V Marlyn and its crew left the Dominican Republic for its drug rendezvous. The Colombian load watcher, Pava-Buelba, joined the F/V Marlyn at sea after it had cleared Dominican Republic customs. The next morning, March 26, 1991, the boat and the plane made radio contact. The plane dropped eight bales of cocaine, which were taken aboard the F/V Marlyn. Waiting in Puerto Rico, Fontalvo, Pagan-San-Miguel, Luciano-Mosquera and Gonzalez-Valentin received word that the airdrop had been successful. A call came in to Pagan-San- Miguel on a cellular phone in Luciano-Mosquera's car, warning that the operation had been discovered and that the police were watching. Pagan-San-Miguel reassured everyone, claiming he had "informants in the authorities" who would give him information and that he had a police scanner. Fontalvo went back to his cabin, leaving the others to proceed.  The F/V Marlyn anchored in Dominican Republic waters until approximately 5:30 p.m. and then began the trip to Buoy #8, the designated meeting place for the F/V Marlyn -7- 7 and the two smaller boats ("yawls"). Around 12:30 a.m. or 1:30 a.m. on March 27, the F/V Marlyn and the yawls, all operating without running lights in the darkness, met several miles off the western coast of Puerto Rico at Buoy #8. The cocaine was roped down into the yawls. Pava-Buelba, Lugo- Maya, Perez-Perez and Gonzalez-Valentin sailed the yawls to Guanajibo Beach, near Mayaguez, Puerto Rico. The landing site on Guanajibo Beach that night was immediately behind the home of Pagan-San-Miguel's father. Two men, one fitting the description of Pagan-San-Miguel, the other of Luciano-Mosquera, approached the landing yawls from the beach and helped to offload the bales of cocaine.  Law enforcement officials had indeed been silently monitoring the operation. The airdrop had been observed by U.S. Customs Service airplanes, which videotaped the mothership. Coast Guard vessels had tracked the F/V Marlyn and the yawls. Camouflaged agents, hidden on the beach, had watched the offloading. Flares went up; arrest signals were given. The conspirators scattered, leaving bales in a line from the yawls to the home of Pagan-San-Miguel's father, along the roughly five-meter wide beach. Pagan-San-Miguel sprinted and sought refuge under an abandoned Volkswagen at a house next to the beach. When found, he was wet and had his jeans rolled up to his knees. Gonzalez-Valentin, dressed in camouflage pants and black T- -8- 8 shirt, completely wet and covered with sand, ran to the gate of Pagan-San-Miguel's father's house. He called out to Pagan-San-Miguel's father to open up, as the police were there. He was arrested at the gate. Luciano-Mosquera and Pava-Buelba were found, about forty minutes after the flares went up, under a jeep parked in a carport by the building where bales of cocaine were left. Pava-Buelba was under the driver's side, Luciano- Mosquera under the passenger's. Pava-Buelba was wet, Luciano-Mosquera was dry. Lugo-Maya headed to sea in one of the yawls and was intercepted by Coast Guard vessels.1 Perez-Perez was arrested near the beach. A later search of Lugo-Maya's escape yawl found a well-hidden box of 50 rounds of ammunition. That ammunition fit the Intratec pistol, which was found in the beached other yawl.  The M-16 was later found hidden in the undercarriage of the jeep where Luciano-Mosquera and Pava- Buelba had hidden in vain. The M-16 was on Luciano- Mosquera's side "at the place where the chass[is] and the [ ] springs of the front of the jeep are located." Two small beepers were found above the chassis on the same side where  ____________________ 1. The F/V Marlyn was not forgotten. The U.S.S. Shark, a Coast Guard vessel, intercepted it, and a boarding party led by Lt. Wendy Abrisz arrested Castillo-Ramos and the two crew members. Fontalvo was later arrested in Miami. -9- 9 the M-16 was found. Two M-16 magazines with twenty bullets in each of them were found on the side of the Pagan-San- Miguel house. The machine gun and the pistol were the same ones Pagan-San-Miguel and Perez-Perez had shown to Fontalvo earlier. No weapons were seen during the observation of the offloading operation and no weapons were found on any of the defendants. There had been no weapons on the F/V Marlyn. Neither Luciano-Mosquera nor Pava-Buelba had arrived at the beach by the jeep. There was no evidence as to who owned the jeep or how the jeep got there.  After being given his Miranda warnings, Pagan-San- _______ Miguel later bemoaned his arrest to a police officer, saying he would have been given $300,000 for his role in the deal. Instead, he was given a sentence of 60 years in prison by the court. Fontalvo and Castillo-Ramos were key government witnesses at trial. The five appellants, Luciano-Mosquera, Lugo-Maya, Pava-Buelba, Pagan-San-Miguel and Gonzalez-Valentin, were found guilty of conspiracy to import cocaine, in violation of 21 U.S.C. 960 and 963 (Count 1); importing 232.8 kilograms of cocaine, in violation of 21 U.S.C. 952 and 18 U.S.C. 2 (aiding and abetting) (Count 2); possessing the cocaine with intent to distribute, in violation of 21 U.S.C. 841(a)(1) and 18 U.S.C. 2 (Count 3); and of knowingly carrying or -10- 10 aiding and abetting the carrying of firearms in relation to the drug trafficking crime of importing the cocaine, in violation of 18 U.S.C. 924(c)(1) and 18 U.S.C. 2 (Counts 4 and 5).  The district court sentenced the appellants on Counts 1, 2, and 3 to terms of imprisonment ranging from 188 to 360 months and to terms of supervised release of five years. It also sentenced the appellants on Count 4, the firearms count as to the M-16, to the mandatory minimum of 360 months imprisonment, to be served consecutively to the terms of imprisonment imposed on Counts 1, 2 and 3. The court dismissed Count 5, the Intratec pistol count, out of -11- 11 double jeopardy concerns.2 It also ordered a special  ____________________ 2. At oral argument a question arose as to whether the district court had in fact dismissed Count 5 or had simply not sentenced on that count. We asked the government to  inform us as to the disposition of the convictions for Count 5. In its response, the government represented that Count 5 had not been dismissed and that the district court had simply not sentenced on that count. Our own review of the docket sheet, however, reveals plainly an order dismissing Count 5, which the government acknowledged when the court called the order to counsels' attention. We take a dim view of the government's conduct in this matter, even if it is viewed as nothing more than negligence. The government now claims that, in any event, the order dismissing Count 5 is a nullity because the order was entered on the docket a few days after each appellant had filed his notice of appeal. Pointing out that as a general rule the entry of a notice of appeal divests the district court of jurisdiction to adjudicate any matters related to the appeal, see United States v. Distasio, 820 F.2d 20, 23 ___ _________________________ (1st Cir. 1987), the government argues that the entry of the notices of appeal divested the district court of jurisdiction over the case and that, absent jurisdiction, the order on Count 5 can have no effect.  But the government forgets that a criminal judgment involving multiple counts is not final and appealable unless the record discloses the precise disposition (e.g., the sentence) for each count. See United States v. Wilson, 440 ___ _______________________ F.2d 1103 (5th Cir.) (no final judgment where the court imposed sentence on three counts of a six count indictment and withheld sentence on three counts)(cited with approval in 15B Charles A. Wright, et al., Federal Practice and ______ ____________________ Procedure, 3918.7 & n.10 (2d ed. 1992)), cert. denied, 404 _________ ____________ U.S. 882 (1971). The district court here had not specified the disposition of Count 5 by the time the notices of appeal were docketed. Absent a disposition on Count 5, there was no final judgment from which the defendants could appeal.  Because there was no appealable order at the time the notices were filed, the notices of appeal could not have divested the district court of its jurisdiction over the case.  Accordingly, the district court had jurisdiction and its order dismissing Count 5 was not a nullity. That the notices were premature does not affect this court's jurisdiction of these appeals. The notices simply relate forward to the entry of judgment. See Fed. R. ___ App. P. 4(b); cf. Yockey v. Horn, 880 F.2d 945, 948 n.4 (7th ___ ______________ Cir. 1989) (where district court inadvertently failed to dismiss one count of a multi-count complaint, notice of -12- 12 assessment of $50 for each of Counts 1-4.  II. CONVICTION ISSUES A. Sufficiency of the Evidence ___________________________ 1. Count 4, the M-16 Firearm Count. _______________________________ Appellants' principal focus is on the denial of their Rule 29 motions at trial for acquittal on Count 4, the M-16 firearm count. Each appellant claims that there was insufficient evidence to support his conviction under Count 4 for carrying, or aiding and abetting the carrying of, the M- 16 during and in relation to the drug trafficking offense, in violation of 18 U.S.C. 924(c)(1) and 18 U.S.C. 2(a). Section 924(c)(1) provides, in pertinent part: Whoever, during and in relation to any . . . drug trafficking crime . . . uses or carries a firearm, shall, in addition to the punishment provided for such . . . drug trafficking crime, be sentenced to imprisonment for five years, . . . and if the firearm is a machine gun . . . to imprisonment for thirty years. . . . .  18 U.S.C. 924(c)(1). Section 2(a) provides: "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. 2(a).  ____________________ appeal that was technically premature related forward after district court entered an order officially dismissing the remaining count). The notices of appeal are treated as if they were filed on the date the order dismissing Count 5 was entered on the docket.  Count 5 is no longer at issue in this case. The government did not cross-appeal from the dismissal, nor has it requested reversal of the dismissal of Count 5. -13- 13 The standard of review for sufficiency of the evidence is familiar. "Our task is to review the record to determine whether the evidence and reasonable inferences therefrom, taken as a whole and in the light most favorable to the prosecution, would allow a rational jury to determine beyond a reasonable doubt that the defendants were guilty as charged." United States v. Mena-Robles, 4 F.3d 1026, 1031 _____________________________ (1st Cir. 1993), cert. denied sub nom. Rivera v. United ____________ _________ __________________ States, 114 S. Ct. 1550 (1994). ______ The facts of this case do not require us to define the precise contours of the meaning Congress intended the phrase "carries" to have, and we note the variety of views on both that issue and the meaning of its companion term "use" in 18 U.S.C. 924(c)(1). See generally United States v. ___ _________ _________________ Joseph, 892 F.2d 118, 126 (D.C. Cir. 1989) (to prove ______ carrying, the government must show that the defendant had the ability to exercise dominion and control over the firearm and that the firearm was within easy reach to protect the defendant during the drug trafficking offense); United States _____________ v. Evans, 888 F.2d 891, 895 (D.C. Cir. 1989) (carrying _________ comprehends more than actually physically wearing or bearing a gun on one's person), cert. denied sub nom. Curren v. _____________ _________ _________ United States, 494 U.S. 1019 (1990); see also United States _____________ _________ _____________ v. Bailey, 36 F.3d 106, 125 (D.C. Cir. 1994) (Williams, J., _________ dissenting) (stating that carrying included situations (1) -14- 14 where a weapon was within easy reach of the defendant, (2) where a defendant had sufficient control over confederates carrying weapons to establish constructive possession, or (3) where a defendant had transported a weapon by motor vehicle and had ready access to the weapon as if it were in his pocket), cert. granted, 115 S. Ct. 1689 (1995); Bailey, 36 ______________ ______ F.3d 106 at 114-15 & n.1 (stating that what constitutes "use" depends upon the nature of the underlying substantive offense); United States v. Paulino, 13 F.3d 20, 26 (1st Cir. ________________________ 1994) (focussing on whether the firearm was available for use in connection with the narcotics trade). Suffice it to say that actual physical carrying of the gun comes within the scope of the statute. See Joseph, 892 F.2d at 126.  ___ ______ The conclusion is reasonable that at least one Puerto Rico based participant in the drug conspiracy physically carried the M-16 to the beach. The M-16 had been at Gonzalez-Valentin's house a few days before the beach landing. It was then found in the undercarriage of the jeep in a carport near the beach, next to a building entryway where bales of cocaine had been brought. Someone brought it from Gonzalez-Valentin's house to the jeep. The fact that the jeep was not otherwise connected to the defendants suggests that sometime before the arrest, the gun was somewhere on the beach and was then brought from the beach and placed under the jeep to avoid detection. That the -15- 15 bullets for the machine gun were found behind Pagan-San- Miguel's house near the bales of cocaine further supports the inference that the gun was either carried onto the beach during the offloading or was nearby as part of the operation. Still, the gun was not found in the hands of anyone at the beach and there is no direct evidence as to who carried the gun. None of the agents watching the offloading saw anyone with a weapon of any kind. Our initial focus then is on the sufficiency of the evidence on the aiding and abetting charge. Aiding and abetting requires that "the defendant [have] associated himself with the venture, participated in it as in something he wished to bring about, and sought by his actions to make it succeed." United States v. Alvarez, 987 F.2d 77, 83 (1st _________________________ Cir.), cert. denied, 114 S. Ct. 147 (1993). Mere association ____________ with the principal, or mere presence at the scene of a crime, even when combined with knowledge that a crime will be committed, is not sufficient to establish aiding and abetting liability. Id.; see also United States v. De la Cruz- ___ _________ ________________________________ Paulino, No. 94-1985 (1st Cir. Aug. 3, 1995). The defendant _______ must have taken some affirmative action that facilitated violation of 924(c)(1).3 Of course, knowledge that a gun  ____________________ 3. A Pinkerton instruction was never given to the jury, nor _________ did the government argue at trial or on appeal that Pinkerton _________ liability should apply. See Pinkerton v. United States, 328 ___ __________________________ U.S. 640, 646-47 (1946). We therefore could not support the convictions on a Pinkerton theory. See United States v. _________ ___ ________________ -16- 16 would be carried is also required. See United States v. ___ _________________ Torres-Maldonado, 14 F.3d 95, 103 (1st Cir.), cert. denied, ________________ ____________ 115 S. Ct. 193 (1994); see also United States v. DeMasi, 40 _________ _______________________ F.3d 1306, 1316 (1st Cir. 1994) (knowledge that co- conspirators would be using a gun may be inferred from defendant's activity in planning and attempting to rob a Brink's armored truck guarded by two armed guards), cert. _____ denied sub nom. Bonasia v. United States, 115 S. Ct. 947 ______ ________ _________________________ (1995). The question here, then, is whether the evidence was sufficient to show that each appellant knew that a firearm would be involved in the drug trafficking offense and took some action in relation to the M-16 that was intended to cause the firearm to be carried during and in relation to the drug trafficking offense. We believe that the evidence was sufficient to convict Pagan-San-Miguel, Luciano-Mosquera and Gonzalez-Valentin under this standard, but was not sufficient to convict Pava-Buelba and Lugo-Maya as to the M-16. As to Pagan-San-Miguel, there was sufficient evidence that he knowingly assisted the carrying of the weapon. He was the ringleader of the importation operation in Puerto Rico. He was a key participant in the meeting at  ____________________ Torres-Maldonado, 14 F.3d 95, 101 (1st Cir.) ("On appeal, we ________________ will not infer either that the jury found guilt based on a theory upon which it was not instructed, or that the jury would have found guilt had it been given a Pinkerton _________ instruction."), cert. denied, 115 S. Ct. 193 (1994). ____________ -17- 17 Gonzalez-Valentin's house during which he and Perez-Perez showed Fontalvo the M-16. He showed Fontalvo the weapon at the meeting and said they had brought it. The jury could certainly infer that he, or Perez-Perez at his direction or with his assistance, procured the M-16 for purposes of using it to protect the operation. The evidence is also sufficient to show that Gonzalez-Valentin knowingly assisted the carrying of the weapon. Gonzalez-Valentin is chargeable with knowledge of the M-16, since the M-16 was displayed in his presence during one of the meetings at his house and the jury could infer that he was present. Moreover, by providing his house for the meeting at which the guns were displayed and discussed, Gonzalez-Valentin assisted the substantive 924(c)(1) offense. As for Luciano-Mosquera, when viewed in the light most favorable to the government, the evidence was sufficient for the jury to infer that he either carried or aided in carrying the weapon to or from the beach and hid the M-16 under the jeep at the time he hid or had placed it there sometime before the arrests. The weapon was directly above him in the undercarriage, no more than an arm's span away. It was also placed up in the undercarriage between the chassis and the springs, so clearly someone took some effort to place the weapon there. He was at the beach with Pagan- -18- 18 San-Miguel to meet the yawls; he arrived at the beach with Pagan-San-Miguel, who supplied the weapon; magazines from the M-16 were nearby; beepers were found near the gun (suggesting a connection between the gun and the drug offense); and the call tipping the conspirators off that the police were watching came into a car phone in his car. This evidence supports the reasonable inference that his proximity to the weapon was more than a mere fortuity. A jury could conclude from these circumstances that Luciano-Mosquera either placed the weapon in the jeep before the arrest signals were given or that he carried the weapon from the beach and hid it underneath the jeep as he was hiding from the police. From these circumstances, a jury could reasonably conclude that Luciano-Mosquera had carried the weapon sometime during and in relation to the offense or at least that he aided in the carrying of the weapon during and in relation to the drug offense. See United States v. Olbres, No. 94-2123, slip op. ___ _______________________ at 17 (1st Cir. July 26, 1995) (evidence must be taken as a whole, in cumulation).  All of the appellants have argued that, regardless of whether the evidence was sufficient to show aiding and abetting "carrying," it was insufficient to show that any carrying was done "during and in relation to" the drug importation offense. They argue that, because their importation efforts ended the moment the flares went up, the -19- 19 subsequently found M-16 machine gun could not have "related to" the drug trafficking. That argument is inventive, but wrong. The jury could easily infer from the discovery of the weapon in close proximity to the offloading operation after the arrest signals were given that it had been carried at a time when the offense was in progress, particularly in light of the evidence that it was brought by the conspirators to a planning meeting and shown off, ammunition for it was found nearby, and it was found close to the bales of cocaine. Further, the legislative history of the 1984 amendment to  924(c) is explicit that where the defendant had a gun during the underlying offense (even if the gun had not been displayed), the section is violated "if from the circumstances or otherwise it could be found that the defendant intended to use the gun if a contingency arose or to make his escape." S. Rep. No. 225, 98th Cong., 2d Sess. 1, 314 n.10 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3492 ____________ n.10; see also United States v. Feliz-Cordero, 859 F.2d 250, ___ ____ ______________________________ 254 (2d Cir. 1988). In sum, the evidence was sufficient to convict Pagan-San-Miguel, Gonzalez-Valentin and Luciano-Mosquera of carrying the M-16 on an aiding and abetting theory. Their convictions on Count 4 are, therefore, affirmed. The evidence as to Lugo-Maya and Pava-Buelba, however, was insufficient to sustain a conviction on Count 4. -20- 20 The only evidence the government presented linking Lugo-Maya to the M-16 was the evidence that 50 rounds of .9mm ammunition for the Intratec pistol were found in the yawls. Evidence of his involvement with the Intratec pistol might have been enough to show knowledge of the M-16 on the inference that the two firearms were together when the Puerto Rico-based participants met to launch the yawls to the F/V Marlyn, and that knowledge of one supports the inference of knowledge of the other. There was no evidence, however, showing that he took any step to assist the carrying of the M-16 in relation to the drug offense. Lugo-Maya was not at the meeting where the M-16 was shown. The government presented no evidence that Lugo-Maya took any steps to procure or otherwise supply the weapons or ammunition. He was also nowhere near the weapon at the time of his arrest. There was simply insufficient evidence to show beyond a reasonable doubt that he either carried or aided and abetted the carrying of the M-16. The government's only evidence connecting Pava- Buelba to the M-16 was the fact that he was found under the jeep in which the M-16 had been hidden. Unlike Luciano- Mosquera, however, Pava-Buelba was on the opposite side of the jeep from where the M-16 was found. Given the darkness and the fact that the gun was stuck up between the chassis and the springs it is not reasonable to infer that Pava- -21- 21 Buelba saw the weapon when he was under the jeep. And also unlike Luciano-Mosquera, there was no evidence linking him to the activities in Puerto Rico, specifically the activities on the beach on the evening of the arrest from which it would be reasonable to infer the requisite knowledge of the weapon before he hid under the jeep. Indeed, Fontalvo's testimony never associated Pava-Buelba with any weapons. Pava-Buelba was simply a load watcher whose job it was to observe and report back to the Colombian supplier about whether the cocaine was successfully delivered. His interests were not the same as the interests of the Puerto Rico-based importers. The first time he set foot in Puerto Rico in connection with this case was when he arrived at the offloading site in one of the yawls. There was no evidence linking him to the Puerto Rico end of the operation where he would have been in a position to know about the specific weapon. Therefore, the inference that he knew about the weapon is much weaker than the inference with respect to Luciano-Mosquera. Moreover, even if there were evidence sufficient to infer that he saw the hidden weapon in the darkness once he crawled under the jeep, given his disconnection with the Puerto Rico side of the operation, such knowledge would have been a mere fortuity. Unlike Luciano-Mosquera, who was found directly beneath the weapon and had substantial dealings with Pagan- San-Miguel during the hours before the arrest, there is -22- 22 insufficient evidence to conclude beyond a reasonable doubt that Pava-Buelba hid under the jeep to be next to the M-16 with the idea that he would carry it. In short, the government did not present evidence that Pava-Buelba knew about the weapon sufficient to support a 924(c) conviction, even on an aiding and abetting theory. Furthermore, there was no evidence that Pava-Buelba ever had actual possession of the weapon. With Luciano- Mosquera lying underneath the gun, it is far from clear that Pava-Buelba was in a position to exercise dominion and control over the weapon. Even if his proximity to the M-16 under the jeep gave him sufficient possession, at most, a theory of constructive possession might have been argued. In this case, however, the district court specifically instructed the jury that a conviction for "carrying" a firearm could not be based on constructive possession of the firearm. Such an instruction sets the benchmark against which the sufficiency of the evidence must be measured. United States v. Gomes, 969 F.2d 1290, 1294 (1st Cir. 1992); _______________________ United States v. Angiulo, 897 F.2d 1169, 1196-97 (1st ___________________________ Cir.)(appellate determination of sufficiency must be constrained by trial court's instructions; "otherwise . . . we would be sustaining a conviction on appeal on a theory upon which the jury was not instructed below"), cert. denied, ____________ 498 U.S. 845 (1990). While the correctness of that -23- 23 instruction might otherwise be open to question, the government did not object to the instruction at trial nor does it argue on appeal that the instruction was error.  See Saylor v. Cornelius, 845 F.2d 1401, 1408 (6th Cir. 1988) ___ ___________________ (although reversal due to a trial error normally does not raise double jeopardy concerns, double jeopardy bar would be triggered where government had failed to object to the error). Issues of the sufficiency of the evidence necessarily involve the tension between deference to the jury's role under the Seventh Amendment as the finder of fact, see Olbres, No. 94-2123, slip op. at 18, and the ___ ______ appellate court's role in providing meaningful review of whether the government has indeed met its burden of proof of guilt beyond a reasonable doubt. That burden is constitutionally mandated. In re Winship, 397 U.S. 358 __ __ _______ (1970). The Supreme Court has said that the relevant question is whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 ____________________ (1979) (emphasis removed). The difficulty of these questions of sufficiency of the evidence to draw reasonable inferences is illustrated in the case law. See, e.g., ___ ____ Stewart v. Coalter, 48 F.3d 610 (1st Cir.) (each of four ___________________ -24- 24 courts reviewing a conviction reach different conclusions as to sufficiency, culminating in a split decision by a panel of this court upholding the conviction), petition for cert. ____________________ filed, No. 94-9742 (U.S. June 19, 1995). _____ In sum, we believe there was insufficient evidence, in light of the government's burden of proof, to convict either Lugo-Maya or Pava-Buelba of carrying or aiding and abetting the carrying of the M-16 and so reverse their convictions on Count 4. There is no direct evidence as to either and an insufficient basis to draw inferences of guilt beyond a reasonable doubt. 2. Drug Counts.  ___________ Gonzalez-Valentin and Luciano-Mosquera also raise sufficiency challenges on the drug counts. As the facts above amply demonstrate, there was overwhelming evidence of each appellant's complicity in the scheme to import the cocaine and of their guilt on the drug counts. Their convictions on the drug counts are affirmed.  B. Other Issues Going To The Verdict _________________________________ The appellants4 -- principally Pagan-San-Miguel -- have raised six other claims of error concerning the district court's conduct of the trial: (1) the limitation of Pagan-  ____________________ 4. Appellants Gonzalez-Valentin and Pava-Buelba have incorporated all arguments made by the other appellants not inconsistent with those otherwise made in their briefs. Our review of the issues applies therefore to their appeals as well. -25- 25 San-Miguel's cross-examination of two government witnesses, (2) the admission of an incriminating statement made by Pagan-San-Miguel, (3) the refusal to grant a mistrial after allegedly improper remarks were made during closing statements, (4) the jury instruction on 924(c)(1), (5) the jury instruction on the defendants' flight from the crime scene, and (6) the allowance of a read-back of testimony by a government witness to the jury during its deliberation. None of these claims of error provides a ground for reversal. -26- 26 1. Cross-Examination. _________________ Pagan-San-Miguel complains that the district court erred in cutting off his cross-examination into the penalties Castillo-Ramos would have faced on firearms counts which were dropped against him. Pagan-San-Miguel attempted to establish bias by showing that the government had been able to procure Castillo-Ramos' cooperation by deciding not to charge Castillo-Ramos under the firearms counts in the second superseding indictment. After questioning on this topic, Pagan-San-Miguel asked Castillo-Ramos whether his attorney had informed him that if he had been "found guilty of the possession of the firearm during the commission of a drug offense [he would be] sentenced to thirty-five years in addition to the drug offense." The district court sustained an objection to this question on the ground that, because defendants faced the same firearms charges, it was an impermissible attempt to inform the jury about the defendants' possible punishment on the firearms counts.  Pagan-San-Miguel claims that this truncating of his cross-examination impermissibly interfered with his right to confrontation under the Sixth Amendment. We disagree. Pagan-San-Miguel had a sufficient opportunity to expose potential biases, including any bias resulting from any benefit Castillo-Ramos received as a result of his cooperation. Pagan-San-Miguel was able to ask Castillo-Ramos -27- 27 repeatedly whether he had received a benefit for his testimony. Any probative value of information about the precise number of years Castillo-Ramos would have faced had he been charged for the firearms offense was slight. The district court properly decided that the value of the information was outweighed by the potential for prejudice by having the jury learn what penalties the defendants were facing.  Although cross-examination is an important component of a defendant's Sixth Amendment rights under the confrontation clause, a defendant's right to cross-examine witnesses is not unlimited. Delaware v. Van Arsdall, 475 _________________________ U.S. 673, 679 (1986). A district court is entitled to cut off cross-examination that may create prejudice or confusion of the issues, or may be harassing or unduly repetitive. Id. ___ Assuming that the minimal constitutional threshold level of inquiry was allowed, as here, a trial court has discretion in limiting cross-examination. A trial court does not abuse its discretion if there is sufficient evidence before the jury (absent the excluded evidence) from which the jury could "make a discriminating appraisal of the possible biases and motivations of the witnesses." Brown v. Powell, 975 F.2d 1, _______________ 5 (1st Cir. 1992), cert. dismissed, 113 S. Ct. 1035 (1993). _______________ That was the case here. -28- 28 2. Pagan-San-Miguel's Incriminating Statement. __________________________________________ Pagan-San-Miguel argues that the district court erred by not conducting a hearing out of the jury's presence, pursuant to Jackson v. Denno, 378 U.S. 368 (1964), and 18 _________________ U.S.C. 3501(a),5 to determine the voluntariness of his incriminating statements. Police Officer Samuel Jusino testified that Pagan-San-Miguel, while being held following his arrest, told Jusino that he "would make three hundred thousand dollars out of [the drug venture]" and, once the arrest signals were given, "that he ran and hid himself underneath a metal plank, and if he had found a hole he would have gone through that place."  Before the issue of a Jackson v. Denno hearing may ________________ be raised on appeal, the issue of voluntariness must have been placed before the district court in a timely and coherent manner. See United States v. Santiago Soto, 871 ___ _______________________________ F.2d 200, 201 (1st Cir.) (failure to raise the issue of voluntariness in a way that would have alerted the trial judge that a Jackson v. Denno hearing was desirable waives ________________ right to hearing), cert. denied, 493 U.S. 831 (1989); see _____________ ___ also United States v. Berry, 977 F.2d 915, 918 (5th Cir. ____ _______________________ 1992) (a generic objection to the admissibility of the  ____________________ 5. Section 3501(a) provides, in pertinent part, that "[b]efore such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness." 18 U.S.C. 3501(a). -29- 29 confession was insufficient to put the court on notice that defendant sought a Jackson v. Denno hearing and therefore the ________________ court's ruling was reviewed for plain error). Pagan-San- Miguel failed to place the issue properly before the trial court here. Pagan-San-Miguel did not specifically object to the admissibility of the statements on voluntariness grounds. He never specifically requested a voluntariness hearing during trial. He never raised the voluntariness issue in his pre- trial motion to suppress statements made to law enforcement personnel. He never raised voluntariness in his objection to the statement at trial. His objection was a narrow foundational one not going to voluntariness -- that at the time of Officer Jusino's testimony no one had yet testified that Miranda warnings had been given to Pagan-San-Miguel _______ before he made the incriminating statements. The court specifically asked Pagan-San-Miguel whether his objection as to foundation was a suppression request and Pagan-San-Miguel informed the court that it was not. Indeed during the colloquy with the district court over the testimony, Pagan- San-Miguel conceded that "there [was] evidence that [Miranda] _______ warnings were properly made and there was a waiver." Given his disclaimer that he was seeking suppression of the statement and the total absence of any evidence that the statements were made involuntarily, Pagan-San-Miguel did not -30- 30 sufficiently apprise the district court that voluntariness was an issue. Thus, Pagan-San-Miguel's claim to a Jackson v. __________ Denno hearing has been waived. _____ There also is no colorable claim here that the district court was nevertheless obliged to hold a voluntariness hearing sua sponte. See Santiago Soto, 871 ___ ______ ___ ______________ F.2d at 202 (recognizing, without adopting, a rule that such a hearing must be given sua sponte under circumstances, "such ___ ______ as a defendant's apparent abnormal mental or physical condition, obvious ignorance or lack of awareness," raising a serious question over voluntariness). At best, Pagan-San- Miguel's argument is that he was so "shell-shocked" by the events that transpired on the beach that the court must have been alerted to the possibility that he did not understand the Miranda warnings that were given to him and that, as a _______ result, his statements made hours later were involuntary. Undoubtedly a defendant who suddenly becomes aware the police are on to him suffers a jolt, but that jolt does not incapacity make. 3. Remarks During Closing Arguments. ________________________________ Pagan-San-Miguel argues that certain remarks made during the closing arguments were unduly prejudicial. He points to four remarks, one made by the attorney for Pava- Buelba and three made by the government. None provides a basis for reversal. -31- 31 Pava-Buelba's attorney, in an apparent effort to distinguish his client and to distinguish the firearms charges from the drug charges, made the following remarks to the jury: I ask you to please keep in mind that the fact that there are a number of defendants here [does] not mean that they were all to be treated as one. And the fact that they were being charged with five different counts does not mean that you had to find them guilty or innocent or all the same, but that you could choose and pick. And that you could discern among the evidence and determine which, if any, were guilty of any of the counts charged. Some might be guilty of one or more. Some might be guilty of none. And I ask you to please be careful watching the evidence so that you will be able to distinguish between each and every individual and each and every count. Pagan-San-Miguel objected to these remarks, arguing they implied that Pava-Buelba was guilty of the drug offenses and thus implicated the other defendants. The district court sustained the objection. Pagan-San-Miguel's later motion for a mistrial was denied, but the court offered to provide a curative instruction, which all defendants declined. Pagan- San-Miguel argues that a curative instruction would have been pointless and that the district court abused its discretion in refusing to grant a new trial. Fatal to Pagan-San-Miguel's claim, however, is that to "require a new trial, we must conclude . . . that, despite the instruction, the misconduct was likely to have affected the trial's outcome." United States v. Capone, 683 F.2d 582, _______________________ 585-86 (1st Cir. 1982) (internal citations omitted). In the -32- 32 context of the full record, these statements could not have had any impact on the outcome of the trial. The evidence of Pagan-San-Miguel's complicity on the drug counts was overwhelming. Moreover, a curative instruction would have solved any spillover problem created by the statements. Pagan-San-Miguel also challenges the government's statement that "Carlos Pagan-San-Miguel can't deny his association with [Fontalvo], that terrible, terrible person that was described to you." Pagan-San-Miguel argues this was an impermissible comment from a prosecutor on an accused's failure to testify. We think it was not. The government did not say that Pagan-San-Miguel "didn't deny his association," only that he "can't deny his association." Even assuming that this comment cut too close to the line, "there is no reason to conclude that the prosecutor intentionally drew attention to the appellant's silence at trial." United ______ States v. Taylor, 54 F.3d 967, 980 (1st Cir. 1995). And the _________________ evidence was otherwise so overwhelming that this comment could have had no effect on the jury's judgment. Id. at 977. ___ Pagan-San-Miguel's next two challenges are to the government's statements that the firearm found under the jeep "would be used to protect the very cocaine that was being illegally smuggled into Puerto Rico" and that "Carlos Pagan- San-Miguel bragged about having bought the firearms." Pagan- San-Miguel argues that the first was misleading in that it -33- 33 suggested that the jury could convict the defendant for planning on using the firearm once it had arrived in Puerto Rico, an offense not charged in the indictment. Pagan-San- Miguel's reading is strained, at best. The first statement was consistent with the evidence and the government's theory. There is no plausible argument that this statement was likely to have affected the outcome of the trial or was so egregious that a new trial is needed as a sanction. See Capone, 683 ___ ______ F.2d at 587. While the second statement appears to have exaggerated the evidence, there was no objection and it does not amount to plain error. See Taylor, 54 F.3d at 977.  ___ ______ 4. Jury Instruction on 18 U.S.C. 924(c)(1). _________________________________________ Pagan-San-Miguel argues that the court erroneously instructed the jury on an essential element of the firearms offense, 18 U.S.C. 924(c)(1). That section requires that the defendant have carried the firearm "during and in relation to . . . [a] drug trafficking crime." The district court, however, instructed the jury that it was enough if the defendant knowingly carried the firearm "during the commission of the crime of drug trafficking." In so doing, the district court appears to have relied on obsolete statutory language. Before 1984, 924(c)(1) provided that it was a crime to carry a firearm "during the commission of any [federal] felony." In 1984, however, Congress amended the language adding the phrase "during and in relation to," -34- 34 to make clear that the firearm must be linked to the underlying felony to come within the scope of the statute. S. Rep. No. 224, supra, at 312-13, reprinted in 1984 _____ _____________ U.S.C.C.A.N. at 3490-92. Because Pagan-San-Miguel did not object to the instruction, the instruction is reviewed for plain error. See Fed. R. Crim. P. 52(b). Pagan-San-Miguel argues that the ___ court's use of the phrase "during the commission of" was plain error, claiming it omitted an essential element of the offense and it broadened the scope of the conduct under which the jury could convict.  The actual charge given here undercuts Pagan-San- Miguel's argument.6 The district court emphasized that the carrying of the firearm must be linked to the specific underlying drug offense for which the defendants were convicted:  First, it must be proven that a[] defendant[] committed a crime of drug trafficking for which he ____________________________ may be prosecuted in the United States. And second, that during the commission of the crime of ____________  ____________________ 6. Faced with a similar challenge the Ninth Circuit has held that the change in statutory language was not substantive and that the requirement that the firearm be linked to the crime was already implicit in the statute. "Though the legislative history does not say so expressly, it strongly implies that the 'in relation to' language did not alter the scope of the statute, explaining that the original section was directed at persons who chose to carry a firearm as an offensive weapon for a specific criminal act." United States v. Stewart, 779 ________________________ F.2d 538, 539-40 (9th Cir. 1985) (internal quotation omitted), cert. denied, 484 U.S. 867 (1987).  ____________ -35- 35 drug trafficking the defendant[] knowingly carried ________________ a firearm. In light of the actual instruction given, Pagan-San-Miguel's attack on the instruction does not rise to the level of plain error.  Pagan-San-Miguel also argues that the instruction allowed the jury to convict for a crime not charged in the indictment because the firearms charge was limited to Count 2 of the three drug counts. Pagan-San-Miguel has not and cannot articulate how, in the context of this case, such a possibility created a "miscarriage of justice" or "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings". See United States v. Olano, 113 S. ___ _______________________ Ct. 1770, 1779 (1993).  5. Jury Instruction on Flight. __________________________ Pagan-San-Miguel also argues that the district court erroneously instructed the jury about his flight and concealment. This argument is meritless. As long as there is an adequate factual predicate supporting an inference of guilt on the crime charged, as there was here, evidence of the accused's flight may be admitted at trial to show consciousness of guilt. See United States v. Hernandez- ___ _____________________________ Bermudez, 857 F.2d 50, 52 (1st Cir. 1988).  ________ 6. Read-Back To The Jury. _____________________ Pagan-San-Miguel and Luciano-Mosquera assert that the district court committed error when it failed to take -36- 36 certain precautions in allowing the testimony of Castillo- Ramos, the boat captain, to be read back to the jury at the jury's request, during deliberations. Counsel did not object to the procedures followed; in fact, what happened was by agreement among counsel.7 To prevail, defendants must show plain error. It certainly would have been preferable for the district court to have taken some precautions. See, e.g., ___ ____ United States v. Hernandez, 27 F.3d 1403, 1408-09 (9th Cir. __________________________ 1994) (reversing a conviction where district court failed to take precautions to prevent undue emphasis on the witness testimony that jury reviewed during deliberation), cert. _____ denied, 115 S. Ct. 1147 (1995). But counsel did not object ______ and the standard set by Olano is not met. In light of the _____ overwhelming evidence of guilt on the drug counts to which Castillo-Ramos' testimony went, the read-back did not result in a miscarriage of justice, nor did the absence of such precautions seriously affect the fairness, integrity or  ____________________ 7. The court reporter entered the jury room unsupervised and read the testimony. The court gave the jury no cautionary instructions (i.e., that the testimony was not to substitute for the jurors' memories, or that the jury should not focus on one particular aspect of the evidence to the exclusion of other evidence). There was no observation of the court reporter's reading of the testimony to ensure that no editorializing or slanting was done during the reading. No instructions were given to the court reporter to be careful not to converse with the jurors or otherwise taint their deliberations and to be careful not to read to the jury potentially prejudicial side-bar conferences she had recorded during the course of Castillo-Ramos' testimony.  -37- 37 public reputation of judicial proceedings. There is no evidence that anything untoward happened in the jury room and no reason to think the reporter did anything other than properly read the pertinent portions of the record. Pagan-San-Miguel and Luciano-Mosquera also argue they were never consulted by either of their attorneys or the court about whether they would waive their right to be present during the read-back. Although the defendant's right to be present at every stage of the proceedings may be waived by the defendant, it is less clear whether the defendant's attorney can waive it. See Taylor v. Illinois, 484 U.S. 400, ___ __________________ 418 & n.24 (1988). Nevertheless, Pagan-San-Miguel and Luciano-Mosquera were present at the time Castillo-Ramos actually gave his testimony and so could "confront" their accuser. There was no plain error. III. SENTENCING ISSUES A. Pagan-San-Miguel ________________ Pagan-San-Miguel challenges his sentence on two grounds, neither of which has merit. He asserts he should not have been given a four level increase as a leader or organizer of the activity under 3B1.1(a) of the Sentencing Guidelines. See United States Sentencing Commission, ___ Guidelines Manual, 3B1.1(a) (Nov. 1991). He also argues he _________________ should have been given a downward adjustment of two levels for acceptance of responsibility under U.S.S.G. 3E1.1(a).  -38- 38 Absent a mistake of law, the district court's determination of a defendant's role may be set aside only for clear error. United States v. Tejada-Beltran, 50 F.3d 105, 111 (1st Cir. ________________________________ 1995). There was no error. The facts outlined earlier establish Pagan-San- Miguel's leadership and organizational role. Fontalvo testified that Pagan-San-Miguel was "the land person in charge of all the merchandise." Indeed, his code names in the operation were "Gigante," "Padrino," and "Godfather." Pagan-San-Miguel's argument that the court made no specific finding that at least four others were under his leadership and control does not help him. It was obvious that nine others, at the least, were involved in addition to Pagan-San- Miguel. And "retention of control over other participants . . . is not an essential attribute of organizer status." Tejada-Beltran, 50 F.3d at 113. ______________ As to acceptance of responsibility, "the determination of the sentencing judge is entitled to great deference on review." U.S.S.G. 3E1.1, comment. (n.5). The fact that Pagan-San-Miguel in pre-trial plea bargaining unsuccessfully offered to plead guilty to the drug counts if certain conditions were met does not provide a sufficient basis to reverse the district court's decision. "This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the -39- 39 essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. 3E1.1, comment. (n.2). His argument is not enough to reverse the district court's determination that he failed to "demonstrate[] a recognition and affirmative acceptance of personal responsibility for his criminal conduct." U.S.S.G. 3E1.1(a); see also United States v. Curran, 967 F.2d 5, 7 ________ ________________________ (1st Cir. 1992). B. Gonzalez-Valentin _________________ Gonzalez-Valentin argues he was a minor participant and thus entitled to a two level reduction under U.S.S.G. 3B1.2(b). The trial judge's determination was not clearly erroneous. See United States v. Lopez-Gil, 965 F.2d 1124, ___ ___________________________ 1131 (1st Cir.), cert. denied, 113 S. Ct. 484 (1992). ____________ Gonzalez-Valentin was at the beach to assist in the offloading; his house was used regularly to plan the drug smuggling; weapons were shown and discussed at his house; a communications radio was hidden and used in his backyard. There was ample evidence he was more culpable than the average participant. See U.S.S.G. 3B1.2, comment. ___ (backg'd.). C. Lugo-Maya _________ In addition to the mandatory sentence of 30 years on Count 4, Lugo-Maya was sentenced under the Guidelines on the drug counts, Counts 1-3. Lugo-Maya challenges on appeal -40- 40 the district court's calculation of his guidelines sentence on the drug counts. He argues the court erred in not giving him two-level reductions each for being a minor participant, pursuant to U.S.S.G. 3B1.2(b), and for acceptance of responsibility, pursuant to U.S.S.G. 3E1.1(a). As the district court properly found, Lugo-Maya was not a minor participant -- he supplied the yawls, sailed one out to the mothership, helped to unload the drugs from the boat, sailed the drugs to shore and helped unload them to the land. As to acceptance of responsibility, Lugo-Maya's claim is factbound, and the district court's resolution of it is not clearly erroneous. See United States v. Royer, 895 F.2d 28, 29 (1st ___ ______________________ Cir. 1990). His sentence on the drug counts is affirmed. IV. SECTION 2255 MOTION ISSUES While these consolidated appeals were pending, Pagan-San-Miguel filed in the district court a motion under 28 U.S.C. 2255 to vacate and set aside his conviction on the ground that the court reporter's delay in providing him with a transcript denied him his right to a timely appeal and, therefore, deprived him of due process of law.8 The  ____________________ 8. Pagan-San-Miguel filed his notice of appeal on August 3, 1992. Around that time, the court reporter agreed to furnish the necessary transcripts to Pagan-San-Miguel. The court reporter, however, did not provide any transcripts to Pagan- San-Miguel until mid-1994. Largely due to the court reporter's failure to prepare the transcripts, this court extended the period for briefing the case sixteen times. On at least three occasions this court entered Orders to Show Cause threatening the court reporter with contempt if she did -41- 41 district court denied the motion.9 On appeal, Pagan-San- Miguel argues that this was error. Although extreme delay in the processing of an appeal may amount to a due process violation, and delays caused by court reporters are attributable to the government for purposes of determining whether a defendant has been deprived of due process, see, e.g., United States v. Wilson, ___ ____ _______________________ 16 F.3d 1027, 1030 (9th Cir. 1994), mere delay, in and of itself will not give rise to a due process infraction. The defendant must show prejudice. See United States v. Tucker, ___ _______________________ 8 F.3d 673, 676-77 (9th Cir. 1993) (en banc), cert. denied, ____________ 114 S. Ct. 1230 (1994). Whether an appellate delay results in prejudice sufficient to warrant reversing a conviction rests, most importantly, on a showing that it has impaired the appeal or the defense in the event of retrial. See id. ___ ___ at 676.  ____________________ not produce the transcripts. 9. We have held that absent extraordinary circumstances a district court should not entertain a 2255 motion while a direct appeal from the same conviction is still pending.  United States v. Gordon, 634 F.2d 638 (1st Cir. 1980).  _______________________ Nevertheless, instead of dismissing Pagan-San-Miguel's motion as being premature, the district court denied the motion. In such a case, we may elect to reach the merits of the 2255 motion. See United States v. Buckley, 847 F.2d 991, 993 n.1, ___ ________________________ 1000 n.6 (1st Cir. 1988), cert. denied, 488 U.S. 1015 (1989); ____________ see also Rule 5, Rules Governing Proceedings in the United ________ States District Courts Under Section 2255 of Title 28, United States Code, advisory committee note (1976). -42- 42 There was no prejudice. Although there was an appalling delay in preparing the transcripts, there is no argument they are incomplete or unreliable. This is not a situation in which the court reporter has prepared an unusable transcript. Compare Wilson, 16 F.3d at 1031 (record _______ ______ had portion missing or was unintelligible so that record was totally unreliable). Indeed, Pagan-San-Miguel only argues that the delay impaired his ability to present "the strongest possible evidence in support of the appellant's version of the facts" surrounding the read-back of Castillo-Ramos' testimony to the jury. As Pagan-San-Miguel concedes, however, no objection was made to the district court's handling of the read-back. And since Pagan-San-Miguel has not shown plain error in this regard, this argument does not make a difference to his appeal.10 The order of the district court denying his 2255 motion is affirmed. CONCLUSION The convictions and sentences of appellants Luciano-Mosquera, Pagan-San-Miguel, and Gonzalez-Valentin are affirmed on all counts. The convictions of Lugo-Maya and Pava-Buelba are reversed on Count 4 and their sentences on  ____________________ 10. Alternatively, Pagan-San-Miguel requests that we set aside his conviction pursuant to our supervisory powers.  This is not an appropriate case for this court to exercise its supervisory powers. See Tucker, 8 F.3d at 676.  ___ ______ -43- 43 that count are vacated. Lugo-Maya's and Pava-Buelba's convictions and sentences on the drug counts, Counts 1-3, are affirmed. The district court's order denying Pagan-San- Miguel's 2255 motion is affirmed. It is so ordered. ________________ -44- 44