# United States Court of Appeals
## For the First Circuit

---

No. 04-1592

UNITED STATES OF AMERICA,

Appellee,

v.

DARIO DELEON, a/k/a RAFAEL GARCIA,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

---

Before

Selya, Lynch, and Lipez, Circuit Judges.

---

Roberto M. Braceras, with whom Christine M. Genaitis and Goodwin Procter LLP were on brief, for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellee.

---

April 7, 2006

---

**LYNCH**, **Circuit Judge**.  It is a crime for an alien to re-enter the country after he has been deported, unless he has the express permission of the Attorney General of the United States (or unless such permission is unnecessary in his case for other reasons).  8 U.S.C. § 1326(a).  The usual sentence for the crime is a term in prison, followed by deportation.

Somewhat unusually in the criminal law, there is an exception provided by statute, id. § 1326(d), for aliens who can prove that the original deportation order was based on administrative proceedings which were fundamentally unfair.  Subsection 1326(d) codifies these due process concerns, which were originally set forth in United States v. Mendoza-Lopez, 481 U.S. 828 (1987).  See United States v. Luna, 436 F.3d 312, 317 (1st Cir. 2006).  The collateral attack on the deportation order pursuant to § 1326(d) requires that the alien make three showings: that he has exhausted administrative remedies, that he was improperly deprived of the opportunity for judicial review, and that the deportation order was fundamentally unfair.

Rafael Garcia was convicted after a jury trial of the crime of illegal re-entry and was sentenced on April 29, 2004 to 33 months' imprisonment and two years of supervised release; he was released from prison on September 2, 2005, and was in immigration custody awaiting deportation as of the close of briefing in this appeal.

His appeal turns largely on attacking rulings by the district court denying his motion to dismiss the indictment under § 1326(d) because he had not met the three criteria for a successful collateral attack, and denying dismissal on statute of limitations grounds. He challenges jury findings that the criminal proceedings were brought within the five-year statute of limitations and that he re-entered the country without the express consent of the Attorney General. Although he has served his term of imprisonment, will be deported,[1] and cannot re-enter the United States legally, he also attacks his sentence of 33 months' imprisonment plus supervised release. Finally, and with some cause, he complains about the delay of more than one year before the district court provided him a transcript for appeal.

The one fact that permeates the analysis in this case, and that affects many of the issues, is that at the time of his original 1995 conviction for sale of crack cocaine and consequent deportation, Garcia gave the false name of Dario DeLeon. He chose to hide from the Immigration and Naturalization Service (INS)[2] both

---

[1] In 1996, Congress replaced the statutory term "deportation" with "removal." See Saint Fort v. Ashcroft, 329 F.3d 191, 197 (1st Cir. 2003). For the sake of consistency, we use the term "deportation" throughout this opinion.

[2] On March 1, 2003, the INS ceased to exist and its principal functions were transferred to the Bureau of Immigration and Customs Enforcement in the Department of Homeland Security. See Homeland Security Act of 2002, Pub. L. No. 107-296, § 471, 116 Stat. 2135, 2205 (codified at 6 U.S.C. § 291(a)). We refer to the agency as the INS throughout.

his true identity and the fact that he had a green card in his true name (Rafael Garcia). Indeed, he asked for a prompt deportation and took no appeal. The district court found as a matter of fact that this was a deliberate scheme of deception on his part so that he could illegally re-enter the country by using his green card and his real name. This is exactly what he did a mere two months after his deportation; he then lived in the United States for nearly eight years as Rafael Garcia. In March 2003, the government learned for the first time that Rafael Garcia was the same person as the deported DeLeon and started these proceedings.

We affirm Garcia's conviction and sentence in all respects and note these key points in our holdings. First, in performing the collateral attack analysis under § 1326(d), the court ordinarily should address the initial test of exhaustion of administrative remedies before going on to the other two tests. Second, we address the situation where an alien claims that the statute of limitations applicable to § 1326 prosecutions has run but the government's lack of knowledge of the alien's presence is a result of the alien's misrepresentations as to his identity. Third, we clarify and reinforce that a defendant who has been delayed in resolution of his appeal by delay in preparation of the trial transcript cannot establish a violation of due process absent a showing of prejudice.

The following facts are undisputed except where otherwise noted.

A.      Garcia's Initial Criminal Conviction and Deportation

Garcia, a native of the Dominican Republic, came to Puerto Rico in 1981 or 1982, when he was approximately twelve years old.  He obtained temporary permanent resident status in 1987 and lawful permanent resident status in 1990.  He later moved to Massachusetts.

In late February 1995, Garcia was arrested in Quincy, Massachusetts and charged with, among other things, selling crack cocaine to undercover officers.  Garcia, who was carrying no identification, told the police his name was Dario DeLeon.  He also gave a false birth date and lied about his father's name.

Garcia, who said he spoke no English, appeared at least twice in Quincy District Court, accompanied both times by an attorney and at least once by an interpreter.  According to a notation in the court records, Garcia was "[a]dvised of right to counsel" and "[a]dvised of alien rights."  He never told the judge or anyone else his real name.  On March 28, still under the name DeLeon, Garcia entered a plea to the drug charge[3] and was sentenced to time served, thirty days' incarceration.

---

[3]  The district court found that Garcia pled nolo contendere, while the government says he pled guilty.  The difference is immaterial to his appeal.

Garcia was then transferred to the custody of the INS. There he again identified himself as DeLeon and consistently denied having legal status. He denied having a visa or a Social Security number and claimed to be unemployed.

The INS Order to Show Cause issued to Garcia (under the name of DeLeon), which was written in both English and Spanish, informed him, among other things, that he could "seek an attorney or representative, if [he] desire[d] to be represented." It also informed him that if he was not satisfied with the eventual decision of the Immigration Judge (IJ), he had the right to appeal. Garcia signed a form (using the name DeLeon) which stated that the Order to Show Cause had been read to him in Spanish. Garcia also signed (as DeLeon) a form that stated, in Spanish, that he was "not a citizen of the United States," that he "d[id] not wish to apply for relief from deportation," and that he "want[ed] to be deported as soon as possible." The form further stated: "This request is completely voluntary. I have not been coerced, threatened, or enticed in any way . . . ."

Prior to his appearance before the IJ, Garcia was provided with a "Notice of Rights" in Spanish. The notice had two relevant sections. The first, entitled "Right to be Represented by an Attorney or Representative," stated:

> If you have any questions regarding any of
> your rights you can speak with an attorney or
> representative who can explain your rights,
> including any relief that may be available to

-6-

you from deportation. The officer who gave you this notice will give you a list of organizations that can provide legal information. Representatives from these organizations will speak to you for free or for a small fee, and some of them might speak your language. . . . You may contact a lawyer or other legal representative at this time or at any other time prior to your departure from the United States.

The second section, entitled "Right to a Hearing Before an Immigration Judge," stated in relevant part:

If you do not want to return to your country, you have a right to a hearing before an immigration judge, who will determine whether you can remain in the United States. If you request a hearing, you may be represented at the hearing by a lawyer or other legal representative at your own expense. If you cannot afford to pay a lawyer, you may contact an organization on the list of free legal services. For example, <u>if you are married to a U.S. citizen or permanent resident, or have lived in the U.S. for seven years or longer, and have not been convicted of a serious crime, you may be eligible for relief from deportation.</u>

(emphasis in the original). Garcia signed the bottom of the form (as DeLeon), indicating he had read it.

Garcia also received, as part of the Order to Show Cause, a page of written information entitled "Notice of Rights and Consequences." It stated, in both English and Spanish: "You will be given a list of organizations, attorneys and other persons who have indicated their availability to represent aliens in these proceedings. Some of these persons may represent you free of charge or for a nominal fee." It noted that hearings before the IJ

-7-

were typically scheduled no sooner than fourteen days after the issuance of the Order to Show Cause "to allow you to seek an attorney or representative, if you desire to be represented."

On April 26, 1995, Garcia appeared before an IJ in Oakdale, Louisiana. A court interpreter was present. The following colloquy ensued:

> IJ: Mr. DeLeon, sir, this is your first appearance in my court, Immigration Court. As such, you're entitled to delaying your case, if you wish, to better prepare your case or to acquire an attorney or we may go forward today, whichever you desire.
>
> Garcia: I cannot afford an attorney. I would like to -- I would like to ask for deportation.
>
> IJ: Do you understand the nature of Immigration Court, sir?
>
> Garcia: Yes.

At that point Garcia took an oath to testify truthfully. The colloquy then continued:

> IJ: Sir, do you understand that you have the right to have an attorney represent you at no expense to the government?
>
> Garcia: Yes.
>
> . . . .
>
> IJ: And you understand, sir, that you have the right to appeal any decision of this court to a higher court in Washington, DC, and you do that through the Federal Court system of this country?
>
> Garcia: Yes.

>IJ: Sir, do you acknowledge previous receipt
>of the Form 6618, the legal aid sheet . . . as
>well as your criminal conviction records?
>
>Garcia: Yes.

Later, Garcia stated (still under oath) that he was not a U.S. citizen or national and that he entered the United States in 1990 without inspection. The IJ found Garcia deportable. The IJ asked the government attorney if he was "aware of any relief" from deportation, to which the government replied: "No, Your Honor." The IJ ordered Garcia deported to the Dominican Republic. He asked Garcia: "Do you wish to accept that decision or is there an appeal?" Garcia replied: "I accept it."

B.        Garcia's Re-entry and Second Conviction

Soon after Garcia's June 1995 deportation, his sister mailed his green card and passport from Massachusetts to him in the Dominican Republic. Less than two months later, in late July 1995, Garcia used these documents to re-enter the United States via Puerto Rico under his real name.[4] He did not inform the immigration officials that he had been deported as Dario DeLeon. An immigration official checked Garcia's permanent resident card and then admitted him. Pursuant to standard practice at that time,

---

[4] Garcia states in his briefs that he re-entered the country in early 1996, but immigration records show that the date was July 29, 1995. The difference is immaterial to all questions on appeal, including the statute of limitations question. We refer to the re-entry date as 1995.

he did not take Garcia's fingerprints, nor did he check the prints already on file for Garcia against any other database.

Garcia eventually moved back to Massachusetts, where he lived under his real name for several years. In March 2003, Garcia argued with two people at a store in Massachusetts. After he left the store, he noticed that the two were following his car. He decided to go to a police station. The police asked him for identification, which he provided (under his real name). The police then arrested him on an outstanding warrant for operating an unregistered vehicle. Garcia was fingerprinted, and the prints were sent to the FBI for a check of the Bureau's database; at that point, authorities realized that Garcia and "DeLeon" were one and the same.

Garcia was charged with the federal crime of illegal re-entry in violation of 8 U.S.C. § 1326. Before trial, he moved to dismiss the indictment under the theories that (1) the 1995 deportation proceeding violated his right to due process and was invalid under § 1326(d), and (2) the indictment was untimely. The district court rejected these contentions in a detailed order, discussed below.

After a four-day jury trial, Garcia was convicted. On April 29, 2004, the district court sentenced him to 33 months' imprisonment (with credit for time served) and 24 months of supervised release. Garcia completed his term of imprisonment on

-10-

September 2, 2005, during the pendency of this appeal, and was transferred to INS custody to await deportation.

## II.

Garcia's primary argument on appeal is that the district court erred when it found that he failed to meet the collateral attack standard under § 1326(d) and refused to dismiss the indictment.

Subsection 1326(d) bars any collateral challenge to the underlying deportation order unless the alien demonstrates the following:

> (1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;
> (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and
> (3) the entry of the order was fundamentally unfair.

8 U.S.C. § 1326(d). Here, the district court found that Garcia had not met the third ground, in part because he could not show fundamental unfairness, as required under § 1326(d)(3). See Luna, 436 F.3d at 316. We review the subsidiary factual findings for clear error and the ultimate mixed conclusion that there was no fundamental unfairness de novo. See id. at 316-17.

Garcia argued before the district court that he was denied the right to counsel during the 1995 deportation proceeding, and therefore that he met prongs (2) and (3) and that he was excused from meeting prong (1). He argued that he was illiterate

in both English and Spanish in 1995, and so the notices informing him of his rights meant little. He also contended that when the IJ told him he could obtain counsel and he replied, "I cannot afford an attorney," the IJ was obligated to pursue the matter. He stated that he never received the legal aid sheet listing pro bono service providers, and that his affirmative answer when the IJ asked him if he had received the sheet was simply a product of his confusion.

Garcia also argued that he met the requirements of § 1326(d) because he did not know he was eligible for relief from deportation. He contended that as a lawful permanent resident, he would have been eligible for discretionary relief under former §§ 212(c) and 212(h) of the Immigration and Nationality Act; he said the government led him to believe he was not eligible for relief, and that the IJ deprived him of his right to be informed about potential relief by failing to mention it.

The district court rejected Garcia's collateral attack, first in a pretrial opinion and order and again after the verdict. The court skipped over the exhaustion and judicial review requirements of § 1326(d)(1) and (d)(2) and instead held that Garcia could not show, pursuant to § 1326(d)(3), that entry of the 1995 deportation order was fundamentally unfair. This was so for several reasons. As to the right to be informed about discretionary relief, the district court found that the IJ's failure to mention it was entirely Garcia's fault: Garcia had lied

to the IJ and INS officials from the beginning, giving them a false name and telling them he had no legal status. Under the circumstances, the court found, the IJ had no duty to tell Garcia about discretionary relief, because the IJ had no way to know Garcia was eligible.[5]

As to the right to counsel, the court found that Garcia had been "notified twice in writing of his right to representation," that the IJ had informed him of his right to obtain counsel yet he had declined, and that he had told the IJ he received the legal aid sheet. In the post-verdict order, the court explicitly found not credible Garcia's testimony during a pretrial motion hearing that he had never received the legal aid sheet, and added that even if he had not received it, that would not render the proceedings unfair, because he told the IJ he had. As to Garcia's purported illiteracy, the district court wrote that it was "certainly relevant to a due process inquiry" but that "it does not excuse [Garcia's] failure to notify the immigration judge . . . that he wanted help in finding an attorney or that he needed help in reading a list of lawyers."

Finally, and importantly, the district court concluded that Garcia could not in any event demonstrate prejudice, as

---

[5] The court rejected Garcia's argument that the IJ and other INS officials should have known, or did know, that Garcia was lying about his identity and status. It found there was "no evidence in the record to support an inference of bad faith or even negligence."

required under § 1326(d)(3), even if he had been denied access to a list of available counsel. This was because Garcia did not intend to avail himself of counsel, but rather intended all along to lie about his identity and be deported as quickly as possible so that he could re-enter using his green card and real name. The court found: "The totality of Defendant's actions and statements indicates that he wanted his true identity and legal status concealed, rather than trumpeted."

On appeal, Garcia presents the broad argument that at his deportation hearing, "the government merely went through the motions and failed to give meaning to [his] rights." He says this is because the IJ "failed to determine whether Mr. Garcia wished to be represented by counsel" and "failed to advise Mr. Garcia of his right to pro bono self-obtained counsel." The brief also argues that Garcia's rights were impinged because "the INS failed to provide Mr. Garcia with a list of legal aid counsel, as it was required to do, thus preventing Mr. Garcia from retaining counsel who would have obtained § 212(c) relief from deportation."

These arguments are an attempt to ignore the district court's findings of fact.[6] The district court explicitly found

---

[6] The brief, for example, entirely fails to inform us that the district court found Garcia's use of the name DeLeon during the original deportation to be a deliberate scheme by Garcia to enhance his prospects for later entry. The brief also asserts, based on Garcia's testimony, that he never received the legal aid sheet, and fails to inform us of the district court's finding that that testimony was not credible. Counsel are not free, on appeal, to

-14-

that Garcia had been advised multiple times of his right to obtain counsel during the immigration proceedings, that his testimony that he never received the legal aid list was not credible, that he never said he wanted a lawyer, and that he never requested time to find a lawyer. The court also found that it was quite unlikely Garcia wanted a lawyer; to further his scheme of fraudulent re-entry, he wanted to be quickly deported under the false name. Those factual findings required a finding that Garcia could demonstrate neither prejudice nor fundamental unfairness. No effort is made to show that the findings are clearly erroneous.

Nonetheless, we have given Garcia the benefit of reviewing the district court's findings against the evidence, and there was no error at all. The district court's ruling that the third precondition for collateral attack was not met is unassailable.

We add that ordinarily, the § 1326(d) analysis should start with the first ground, which the district court skipped over.[7] Congress has mandated that "an alien may not challenge the

---

ignore the district court's findings and argue the facts de novo, even if the ultimate conclusion of law drawn by the district court from the facts is subject to de novo review.

[7] While courts have some leeway in the structuring of opinions, it is quite clear that Congress has, particularly in the immigration laws, placed a premium on exhaustion of agency remedies. In many cases, if there has been no such exhaustion by taking an appeal to the Board of Immigration Appeals, a court would not consider the petitioner's claims.

validity of the deportation order" unless that alien "exhausted any administrative remedies that may have been available to seek relief against the order."  8 U.S.C. § 1326(d)(1) (emphasis added).  It is clear that appeal to the Board of Immigration Appeals (BIA) is such an administrative remedy, and that failure to take such an appeal constitutes a failure of exhaustion.  See Sayyah v. Farquharson, 382 F.3d 20, 27 (1st Cir. 2004).  It is also undisputed that Garcia explicitly waived his right to appeal to the BIA when he asked to be deported "as soon as possible" and subsequently told the IJ he accepted the decision ordering him deported.  Barring some exception to the exhaustion requirement, therefore, Garcia may not challenge the deportation order's validity.

Garcia argues that just such an exception exists.  He relies on cases from other courts which have concluded that the § 1326(d)(1) exhaustion requirement "cannot bar collateral review of a deportation proceeding when the waiver of [the] right to an administrative appeal did not comport with due process," United States v. Muro-Inclan, 249 F.3d 1180, 1183 (9th Cir. 2001), and therefore that "failure to exhaust administrative remedies bars collateral review of a deportation proceeding under Section 1326(d)(1) . . . only where an alien's waiver of administrative review was knowing and intelligent," United States v. Sosa, 387 F.3d 131, 136 (2d Cir. 2004); see also Muro-Inclan, 249 F.3d at 1183 (waiver must be "considered and intelligent" (internal

-16-

quotation marks omitted) (quoting United States v. Arrieta, 224 F.3d 1076, 1079 (9th Cir. 2000))); United States v. Martinez-Rocha, 337 F.3d 566, 569 (6th Cir. 2003).

Whether or not this court would create such an exception to the exhaustion requirement, a question on which we take no view, the facts here preclude the argument. Garcia was told at least twice -- once when the Order to Show Cause was read to him, and again by the IJ -- that he had the right to appeal. He was asked again by the IJ later in the proceeding whether he desired to appeal. He stated that he did not; he also signed a form indicating that he did not wish to contest deportation. Given this record, Garcia's waiver was knowing and intelligent. See United States v. Johnson, 391 F.3d 67, 75 (2d Cir. 2004) (finding knowing waiver where the IJ "clearly advised" the alien of his right to appeal); Martinez-Rocha, 337 F.3d at 569 (finding knowing waiver in part because the alien signed a form, read to him in Spanish, stating that he did not wish to contest the charges). Further, the district court found on ample evidence that Garcia never had any intention of appealing, because he wanted to be deported as quickly as possible so that he could re-enter under his real name. See Martinez-Rocha, 337 F.3d at 569 (finding of knowing waiver was supported by an INS agent's testimony that the alien "had expressed a desire to return to Mexico as soon as possible").

Garcia argues that his waiver was not knowing and intelligent because the IJ did not tell him he was eligible for discretionary relief and the government attorney "affirmatively informed [him] that he was not entitled to any discretionary relief." Again, the argument depends on ignoring the district court's factual findings. It was Garcia's lies about his identity and his failure to disclose his green card status that hid his potential eligibility from the government and the IJ.[8] He gets no reward for that. Cf. 8 C.F.R. § 1240.49(a) (stating in the context of other forms of relief that the IJ "shall inform the respondent of his or her apparent eligibility") (emphasis added).

In sum, Garcia knew precisely what he was doing when he decided to forgo an appeal of his 1995 deportation order; if there is an exception to the § 1326(d)(1) exhaustion requirement, he does not fall within it. His challenge to the 1995 deportation order fails.

## III.

A.  The Statute of Limitations

The crime of illegal re-entry is subject to a five-year statute of limitations, 18 U.S.C. § 3282. The district court denied Garcia's pretrial motion to dismiss the indictment on

---

[8] In all events, as a factual matter, Garcia received and signed at least one form telling him that aliens with various types of status in the United States, such as those married to permanent residents and those who had spent many years in the country, could be eligible for relief.

limitations grounds.  The issue also was submitted to the jury, which made a specific finding that the government had proved the indictment was timely.  We review the district court's pretrial ruling de novo and the jury's finding for sufficiency of the evidence.  See United States v. Walsh, 928 F.2d 7, 12 (1st Cir. 1991) (holding that district court did not err as a matter of law in refusing to dismiss an indictment where "a jury could reasonably have concluded" on the evidence at trial that the limitations period had not run).

"[A] deported alien who illegally reenters and remains in the United States can violate [8 U.S.C. § 1326] at three different points in time: when he 'enters, 'attempts to enter,' or when he 'is at any time found in' this country." United States v. Cuevas, 75 F.3d 778, 784 (1st Cir. 1996) (quoting 8 U.S.C. § 1326(a)(2)). Where an alien is indicted under the "found in" prong, as Garcia was here, the alien is deemed to have committed the offense at the moment he was "found." Id. (citing United States v. Rodriguez, 26 F.3d 4, 8 (1st Cir. 1994)).

Garcia argues the government could have found out earlier that he was illegally in the United States and that its lack of diligence should be held against it.  The argument is based on language from other courts in factually distinct cases to the effect that an alien is "found" for § 1326 purposes "when immigration authorities could have, through the exercise of

diligence typical of law enforcement authorities, discovered the violation" -- in other words, when they had constructive knowledge that the alien was in the country illegally. See United States v. Gomez, 38 F.3d 1031, 1037 (8th Cir. 1994); see also United States v. Herrera-Ordones, 190 F.3d 504, 510 (7th Cir. 1999). Garcia argues that the jury was compelled to find that the government had the requisite constructive knowledge as soon as he re-entered the country, and so the limitations period ran several years before his 2003 indictment. This, he says, is because diligent immigration authorities would have realized at the time of his 1995 re-entry that he and "DeLeon" were the same person.

The district court, in considering Garcia's motion to dismiss, accepted the existence of this constructive knowledge theory for purposes of analysis. It examined pre-trial affidavits and other evidence submitted by the government which stated that immigration procedures in place in 1995 did not involve checking the fingerprints of arriving green card holders like Garcia against any database of criminals or of past deportees. The district court found that based on this evidence, and on the fact that Garcia lied about his identity during the deportation process, it could not say as a matter of law that immigration officials exercising ordinary diligence should have known at the time of Garcia's re-entry that he previously had been deported.

We approach the question differently. This court has never adopted the theory that the government may be charged with constructive knowledge of an alien's illegal re-entry for purposes of § 1326, and there are certainly good arguments against the theory in this context. We do not, however, resolve the broad question of whether constructive knowledge can be attributed to the government. We hold more narrowly that for statute of limitations purposes in § 1326 prosecutions, there can be no finding of lack of diligence where it is deception by the alien as to his identity that has caused the government not to have knowledge of his presence. To hold otherwise would be to reward deceit by the alien and to encourage the withholding of information, and so the corruption of the deportation process.[9] Cf. United States v. Mercedes, 287 F.3d 47, 55 (2d Cir. 2002) ("[I]t is difficult not to find Mercedes's claim regarding the delay disingenuous when he was the one who attempted to deceive law enforcement officials by concealing his true identity"). In any event, the facts before the district court prior to trial showed that the government could not, in the ordinary course, have discovered the deception, and so there would be no basis for a constructive knowledge claim even if one were cognizable.

---

[9] Garcia relies on Gomez, 38 F.3d 1031, for the conclusion that the constructive knowledge rule should apply even where an alien's deception prevented immigration officials from learning his true identity. To the extent Gomez can be read to so hold, we reject it.

Finally, any claim that there was insufficient evidence to support the jury's finding of timeliness fails. The government introduced evidence at trial to the effect that it did not know Garcia had illegally re-entered the country until he was arrested in 2003; this evidence was uncontradicted. The jury had ample basis to find that it was not a lack of diligence by the government that resulted in the timing of the indictment in this case.

B.        Consent to Re-enter

Garcia next argues the evidence was insufficient to support the jury's conclusion that he lacked the Attorney General's consent to re-enter the country. "In reviewing such a challenge, we consider the record evidence (and any reasonable inferences therefrom) as a whole and in the light most favorable to the prosecution, asking whether the evidence would have permitted a rational jury to find the defendants guilty of the crime charged beyond a reasonable doubt." United States v. Downs-Moses, 329 F.3d 253, 261 (1st Cir. 2003). "'[T]he evidence may be entirely circumstantial, and need not exclude every hypothesis of innocence . . . .'" United States v. Meléndez-Torres, 420 F.3d 45, 49 (1st Cir. 2005) (internal quotation marks omitted) (quoting United States v. Scantleberry-Frank, 158 F.3d 612, 616 (1st Cir. 1998)).

To convict Garcia of violating 8 U.S.C. § 1326(a), the jury must have found that the government proved beyond a reasonable doubt that Garcia was an alien, that he had been deported, that he

entered or attempted to enter or was later found in the United States, and that he did so "without the express consent of the Attorney General for such entry." Id. (citing Scantleberry-Frank, 158 F.3d at 616); see 8 U.S.C. § 1326(a). At trial, the government presented evidence as to the "express consent" prong -- specifically, a Certificate of Nonexistence of Record stating that no such consent appeared in the INS A-File[10] on "Dario DeLeon." Garcia argues that since the INS kept a separate A-File on "Rafael Garcia," the jury could not convict absent evidence that no indication of consent appeared in the Rafael Garcia file either. Since the government produced no such evidence, he says, it failed to carry its burden.

This argument is without merit. Garcia's own lies led to his deportation under the name DeLeon. If he had requested permission to re-enter after deportation, he would have had to do so as DeLeon (otherwise the request would have made no sense to the immigration authorities) and any such permission logically would be in the "DeLeon" file. Further, as the district court found, the evidence supports the conclusion that Garcia schemed to be deported under a false name so he could immediately re-enter using his real identity. A jury could reasonably infer that Garcia never would have requested permission (under any name) to re-enter, since such

---

[10] An INS A-File "records every contact an alien has with the immigration service." Meléndez-Torres, 420 F.3d at 47.

a request would have alerted the INS to his deception. In short, the evidence is more than sufficient to sustain the jury verdict.

Garcia falls back to an argument that he in fact had express permission to re-enter the country because he did so using his green card, which was issued by the Attorney General and which he says constitutes the requisite permission. As the district court said: "Under defendant's interpretation of the statute, he can lie about his identity . . . and then re-enter with impunity using a green card under his real name. This would obviously frustrate the statutory purpose of keeping previously-deported aliens from reentering the country without the Attorney General's 'express' prior permission." Garcia had just been deported, regardless of what name he was using at the time, and he therefore needed the Attorney General's contemporaneous permission before he could legally re-enter. 8 U.S.C. § 1326(a). If Garcia had been deported under his real name, his green card likely would have been revoked, and in any event obviously would not constitute such permission.[11] He can gain no advantage from having deceived the INS about his identity.

---

[11] Garcia cites a case, United States v. Idowu, 105 F.3d 728 (D.C. Cir. 1997), for the proposition that even an invalid green card is enough to constitute Attorney General consent. The Idowu court held no such thing. It said only that the defendant alien might not have needed consent at all because more than five years had passed since his deportation; because the crucial question involved passage of time, the court noted that the validity or invalidity of his arrival documents was irrelevant to its analysis. Id. at 731.

C.        The Almendarez-Torres Issue

        Garcia argues that his conviction must be vacated because the district court did not submit to the jury the question of his underlying 1995 drug conviction.  He argues that the district court was required to do so because Almendarez-Torres v. United States, 523 U.S. 224 (1998), in which the Supreme Court held that the prior conviction is a mere sentencing factor for § 1326(b) purposes, id. at 235, has been overruled by subsequent case law.  He relies on Justice Thomas' concurrence in Shepard v. United States, 125 S.Ct. 1254 (2005), which stated that in light of Apprendi v. New Jersey, 530 U.S. 466 (2000), and subsequent Sixth Amendment jurisprudence, "a majority of the Court now recognizes that Almendarez-Torres was wrongly decided."  Shepard, 125 S.Ct. at 1264 (Thomas, J., concurring in part and concurring in the judgment).

        As an initial matter, we note that Garcia seems to be mixing apples and oranges in challenging his conviction on this basis.  The cases upon which he relies largely go to whether a judge may consider a prior conviction for sentencing purposes when that conviction has not been found by a jury beyond a reasonable doubt.  See id. ("Innumerable criminal defendants have been unconstitutionally sentenced under the flawed rule of Almendarez-Torres . . . .") (emphasis added).  Perhaps Garcia is making a sentencing argument.

Either way, however, Garcia's argument fails.  Garcia stipulated to the prior conviction at trial: his counsel not only affirmatively told the jury about the fact of a prior conviction and agreed to the entry into evidence of a redacted record of the conviction, but also argued prior to trial that "evidence of [the] conviction is wholly irrelevant to [Garcia's] charged illegal reentry offense and has the potential to prejudice Mr. Garcia unfairly."  Garcia has waived any argument that the jury needed to find the fact of conviction beyond a reasonable doubt.  See Blakely v. Washington, 542 U.S. 296, 310 (2004) ("[A] defendant who stands trial may consent to judicial factfinding as to sentence enhancements, which may well be in his interest if relevant evidence would prejudice him at trial."); see also United States v. Glover, 413 F.3d 1206, 1208 (10th Cir. 2005) ("In regard to sentencing, a defendant may waive his Sixth Amendment rights under Apprendi and Blakely by stipulating to facts underlying sentence enhancements.") (citing Blakely, 542 U.S. at 310).

Further, even had Garcia not waived the issue, his precise argument has already been rejected by a panel of this court.  United States v. Ivery, 427 F.3d 69, 75 (1st Cir. 2005). In Ivery, the court noted that the Supreme Court has taken care to reaffirm the "prior conviction" exception of Almendarez-Torres in all of its recent Sixth Amendment jurisprudence, and that even the Shepard majority cautioned that it "is up to the future to show"

-26-

whether <u>Apprendi</u> eventually will be extended to require proof of prior convictions to a jury. <u>Id.</u> (internal quotation marks omitted) (quoting <u>Shepard</u>, 125 S.Ct. at 1263 n.5). The <u>Ivery</u> panel concluded: "It is not our place to anticipate the Supreme Court's reconsideration of its prior rulings; thus <u>Almendarez-Torres</u> remains binding law that we must apply until overruled by a majority of the Supreme Court." <u>Id.</u> We in turn are bound by <u>Ivery</u>'s holding.

D.      <u>Booker Issue As to Garcia's Term of Supervised Release</u>

Garcia has now served the imprisonment portion of his sentence and is subject to a two-year term of supervised release, but is in the hands of immigration authorities and awaiting deportation, if he has not yet been deported. Nonetheless, in a long footnote in his brief on appeal, Garcia says he is entitled to be resentenced, presumably to alter the sentence of supervised release.

Garcia was sentenced under the mandatory Guidelines scheme in place prior to <u>United States</u> v. <u>Booker</u>, 543 U.S. 220 (2005). He concedes that his <u>Booker</u> claim was not preserved in the district court, but says he meets the "reasonable probability" standard this court requires under plain-error <u>Booker</u> review, <u>United States</u> v. <u>Antonakopoulos</u>, 399 F.3d 68, 75 (1st Cir. 2005), because the district judge sentenced him at the bottom of the applicable Guidelines range and stated that his case was

-27-

sympathetic.  The government argues that we cannot reach the Booker issue because it is moot.

It is well-settled that a convict's claim is not moot if he has finished his prison term but still faces supervised release or a restitution order, so long as those conditions give him "a continuing stake in the outcome of a challenge" to the sentence. United States v. Molak, 276 F.3d 45, 48 (1st Cir. 2002); see also United States v. Prochner, 417 F.3d 54, 59 n.4 (1st Cir. 2005).

The government argues that the supervised release sentencing issue is moot on these facts.  The argument is that Garcia, who is in immigration custody and facing imminent deportation from the United States, will never be subject to the supervised release portion of his sentence.  The government argues that the possibility that Garcia could one day return to the United States does not change the analysis.  This is because Garcia is inadmissible as a result of his 1995 cocaine conviction, 8 U.S.C. § 1182(a)(2)(A)(i)(II), and ineligible for a waiver of inadmissibility, id. § 1182(h)(2).  Therefore, Garcia could only be in the United States, and potentially subject to supervised release, if he broke the law to get here; this will not suffice, the government argues, because a stake in the outcome of a case will not create standing if it is "contingent upon [the defendant's] violating the law" in the future.  Spencer v. Kemna, 523 U.S. 1, 15 (1998).

There is some case law supporting the government's theory. See Okereke v. United States, 307 F.3d 117, 121 (3d Cir. 2002) (finding alien's sentencing appeal moot where alien had been removed and could not legally reenter, and resentencing "would not provide [him] with the tangible benefit of reentry"); United States v. Mercurris, 192 F.3d 290, 294 (2d Cir. 1999) (finding moot a deported alien's claim that the district court erroneously deemed his crimes "aggravated felonies" because the alien "ha[d] only a quixotic chance of legally returning to the United States" and "the possibility that his aggravated felon status could make a difference to him . . . is too speculative to create an Article III case or controversy"). Defendant has not, in response, identified any practical impact on him of the Booker supervised release issue. If there is one, it is not up to the appellate court to try to guess what it is. Without adopting a general rule, we hold that any Booker issue in this case is moot.

E.       The Transcript Delay

A disturbing aspect of this case is the fourteen-month period it took for the court reporter to produce the trial transcripts for appeal. Unfortunately, this is a recurring problem in some districts within the circuit, and not a new one. See, e.g., United States v. Pratt, 645 F.2d 89, 91 (1st Cir. 1981) (nine-month delay in preparing a transcript).

Garcia filed a Notice of Appeal on April 30, 2004. On June 8, 2004, this court ordered the district court's court reporter to file, by August 9 of that year, transcripts of Garcia's trial and related proceedings.

The period of time until the transcript was prepared was a shared responsibility of this court, the district court, and Garcia. The court reporter was granted several extensions, without objection, which pushed the deadline back to November 1. When the transcript was not prepared by that date, this court issued an Order to Show Cause directing production of the transcripts by November 22. Several more rounds of orders and extension requests followed.

On August 11, 2005, some fourteen months after the Notice of Appeal, Garcia first moved to compel production. This court granted the motion, and the transcripts were finally filed on August 19, 2005. Garcia says this delay violated his due process right to a timely appeal, and that the remedy must be reversal of his conviction. The prosecution, which is of course not actually responsible for the transcript delay, is nonetheless deemed to be responsible, as the government candidly admits.

The concern is where delay in the appeal due to a tardy transcript may violate the due process rights of the defendant. "[E]xtreme delay in the processing of an appeal may amount to a due process violation, and delays caused by court reporters are

attributable to the government for purposes of determining whether a defendant has been deprived of due process . . . ." United States v. Luciano-Mosquera, 63 F.3d 1142, 1158 (1st Cir. 1995) (citing United States v. Wilson, 16 F.3d 1027, 1030 (9th Cir. 1994)).  However, "mere delay, in and of itself will not give rise to a due process infraction.  The defendant must show prejudice." Id.

Furthermore, as the Supreme Court has said in the context of pre-indictment delay, even proof of actual prejudice does not make a due process claim "automatically valid." United States v. Lovasco, 431 U.S. 783, 789 (1977).  The court "must consider the reasons for the delay as well as the prejudice to the [defendant]." Id. at 790.  The showing of prejudice is therefore a threshold requirement.  See id.; see also Luciano-Mosquera, 63 F.3d at 1158. The prejudice must be such as to render the proceedings "fundamentally unfair." Lovasco, 431 U.S. at 796.

The question of what constitutes prejudice is one on which the circuits have differing views.  Garcia has, relying on case law from elsewhere, argued that certain effects of delay constitute prejudice.  We reject the arguments.  Based on what is properly cognizable as prejudice, we hold that Garcia has not made his threshold prejudice showing.

### i.    Cognizable Forms of Prejudice

We have recognized two forms of possible prejudice.  It is possible for delay to so impair a defendant's ability to present his appeal as to create prejudice to the appeal itself. Luciano-Mosquera, 63 F.3d at 1158.  It also is possible that even where a defendant wins his appeal, the delay in preparing the transcripts on appeal could have prejudiced his right to make his case on retrial.  Id.

We see no impairment of Garcia's ability to present his appeal.  He was and has been present in this country and has had access to counsel.[12]  When we look as well at the substance of the arguments he has presented on appeal, the failure of those arguments has not in any way been caused by the delay.  Since he has lost his appeal there can be no impairment of his rights on retrial.

To the extent Garcia argues that any particular period -- here, a one-year delay from the original due date of the transcript

---

[12]    According to his reply brief, Garcia was still awaiting deportation as of December 29, 2005, six weeks prior to oral argument.  We do not know whether his deportation has been delayed because of his appeal.  We presume it has not, however, since Garcia did not request a stay of deportation from this court, and absent such a stay the government may deport an alien during the pendency of an appeal.  See Neverson v. Farquharson, 366 F.3d 32, 38 (1st Cir. 2004) ("The INS immediately took Neverson into custody and prepared to deport him . . . .  On Neverson's emergency motion, this court issued a provisional stay . . . barring the INS from deporting Neverson until we could hear and decide his case.").  Garcia suggests as much in his reply brief.

-- per se amounts to a due process violation, we reject the argument. This circuit's requirement is that the defendant must show prejudice, and we will not presume prejudice from the length of the delay. See Luciano-Mosquera, 63 F.3d at 1158; see also id. at 1158 & n.8 (describing approximately two-year delay in furnishing transcripts as "appalling" but rejecting defendant's claim for lack of prejudice); Pratt, 645 F.2d at 91 (declining to hold a nine-month delay unconstitutional, "at least in the absence of exacerbating factors"). There can be no per se rules on the length of delay because this court, in the exercise of its supervisory authority, is bound by the rule that a showing of prejudice is ordinarily needed for due process claims. See United States v. Tucker, 8 F.3d 673, 676 (9th Cir. 1993) (en banc) ("[A] federal court may not exercise its supervisory powers to reverse a conviction absent a showing of prejudice.").

### ii.  Garcia's Other Arguments

Garcia also argues that he was prejudiced in ways which, in our view, are simply not cognizable on a due process claim in this context. Specifically, he argues that due to the delay, he has suffered anxiety and "oppressive incarceration" during the pendency of his appeal. He bases this argument on decisions by other courts which have drawn an analogy between the right to a timely appeal and the right to a speedy trial. See, e.g., United States v. Hawkins, 78 F.3d 348, 350 (8th Cir. 1996); United States

v. Mohawk, 20 F.3d 1480, 1486 (9th Cir. 1994); Rheuark v. Shaw, 628 F.2d 297, 303 (5th Cir. 1980). We reject the argument and differ from these courts. We explain why.

A due process claim about delays on appeal is not the same as a Sixth Amendment speedy trial claim. In Barker v. Wingo, 407 U.S. 514 (1972), a case under the Sixth Amendment, the Supreme Court identified four criteria, of which prejudice is only one, to determine when the right to a speedy trial is violated. Id. at 530. The Court held that it is possible to have a violation of the speedy trial right without a specific showing of prejudice. Id. at 533. By contrast, there is no Sixth Amendment speedy trial claim to be made as to appeals, with the possible exception, not involved here, of interlocutory appeals. See United States v. Loud Hawk, 474 U.S. 302, 313-17 (1986); see also United States v. Smith, 94 F.3d 204, 206 (6th Cir. 1996) ("The speedy trial guarantee of the Sixth Amendment applies only to proceedings in the trial court."). The right of appeal is statutory, and the grant is subject to due process requirements. Evitts v. Lucey, 469 U.S. 387, 393 (1985).

In Barker, three categories of potential prejudice were identified: oppressive pretrial incarceration, anxiety and concern of the accused, and the possibility that the accused's defense might be impaired. 407 U.S. at 532. Those courts that have accepted the analogy between pretrial delay and appellate delay have adopted this inquiry almost whole cloth and looked for three

kinds of potential prejudice from appellate delay: "(1) oppressive incarceration pending appeal, (2) anxiety and concern of the convicted party awaiting the outcome of the appeal, and (3) impairment of the convicted person's grounds for appeal or of the viability of his defense in case of retrial." Hawkins, 78 F.3d at 351 (internal quotation marks omitted) (quoting Tucker, 8 F.3d at 646); see also Rheuark, 628 F.2d at 303 n.8.

In our view, the due process issues caused by delay on appeal are more limited than those resulting from delay in the trial court. Cf. Ross v. Moffitt, 417 U.S. 600, 610 (1974) (noting, in the context of due process requirements, that "there are significant differences between the trial and appellate stages of a criminal proceeding"). And so we reject, at least in cases of delayed transcripts on appeal, the direct analogy made to tests involving the Sixth Amendment speedy trial right, which underlies the so-often articulated three-factor prejudice test quoted above. Other courts have shared this concern. See, e.g., Cody v. Henderson, 936 F.2d 715, 719 (2d Cir. 1991) ("Certainly, the differences in a defendant's situation before trial and after conviction suggest that at the very least the Barker factors should not be applied uncritically."); see also Arkin, Speedy Criminal Appeal: A Right Without A Remedy, 74 Minn. L. Rev. 437, 473-81 (1990) (concluding that the concerns of Barker, and the Barker test, do not translate to the appellate delay setting).

The first two of the adopted <u>Barker</u> prejudice factors have little rationale in the appellate context. A defendant who has been convicted of a crime no longer enjoys a presumption of innocence, <u>Herrera</u> v. <u>Collins</u>, 506 U.S. 390, 399 (1993), and so his incarceration pending appeal cannot itself be said to be "oppressive." Further, there are other remedies concerning conditions of confinement. The appellant may or may not meet the requirements for bail on appeal.[13] If the conditions of incarceration raise Eighth Amendment concerns, habeas corpus is available. Similarly, while any defendant who has been convicted of a crime may experience anxiety during the pendency of the appeal, this consideration is not useful to evaluating prejudice for due process purposes.

Because Garcia has not shown prejudice, we do not reach the reasons for the delay. Sometimes the reasons involve inadequate resources in the reporting services available to the district court, or overly busy court reporters; sometimes there are

---

[13] Indeed, delay in the appeals process may itself strengthen an appellant's case for having met those requirements, so long as that delay is not attributable to the appellant. <u>See</u>, <u>e.g.</u>, <u>Leigh</u> v. <u>United States</u>, 82 S.Ct. 994, 997 (1962) (Warren, Circuit Justice) (granting bail where "th[e] appeal is not frivolous, . . . such delays as have occurred can hardly be attributed to applicant . . . [and] [t]he Government does not contend that there is a likelihood that applicant will flee the jurisdiction."); <u>United States</u> v. <u>Bentvena</u>, 308 F.2d 47, 48 (2d Cir. 1962) (rejecting bail but noting that "[i]f for any reason there are delays in the hearing of these appeals for which the appellants are not responsible these motions may be renewed.").

other reasons.  The problem of delay in production of transcripts is a very serious one, but one which cannot be used to benefit a defendant absent a showing of prejudice.

**IV.**

Garcia's conviction and sentence are <u>affirmed</u>.